JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Defendant-appellant, Anthony Petitto, appeals his convictions for rape and gross sexual imposition. For the reasons that follow, we affirm, but remand for correction of the trial court's entry of conviction.
 {¶ 2} Appellant was charged in a five-count indictment with rape, gross sexual imposition and kidnapping for offenses alleged to have occurred between July and August 2005 against the minor victim, R.C.[1] Prior to trial, count one, rape, count three, gross sexual imposition, and count five, kidnapping, were dismissed by the State. Also prior to trial, the State filed a motion to admit other acts evidence pursuant to Evid.R. 404(B) and R.C. 2945.59, which was opposed by the defense. The trial court granted the State's motion.
 {¶ 3} The case proceeded to a jury trial on count two, rape in violation of R.C. 2907.02(A)(1)(c), and count four, gross sexual imposition in violation of R.C. 2907.05(A)(5). Both counts contained sexually violent predator specifications, which were bifurcated and tried to the court.
 {¶ 4} At the conclusion of the State's case, the defense made a Crim.R. 29 motion for acquittal, which was denied. The defense rested without presenting any evidence, and renewed its Crim.R. 29 motion, which was again denied. *Page 4 
 {¶ 5} The jury found appellant guilty of rape and gross sexual imposition. The court found appellant not guilty of the sexually violent predator specifications.[2] After a sexual predator hearing, appellant was found to be a sexually oriented offender. The trial court sentenced appellant to four years on the rape and 12 months on the gross sexual imposition, to be served concurrently.
 {¶ 6} The testimony at trial revealed that the victim, R.C., a minor girl, would often visit appellant's house so that she could see his two minor daughters, who were her cousins. Appellant, his girlfriend Deborah Walker, and their two daughters lived in the back portion of the house, and appellant's mother and her boyfriend lived in the front of the house. The two portions of the house were connected by a door.
 {¶ 7} R.C. lived with her mother, Carrie Lee,[3] and her two minor sisters. R.C. testified that sometime in either 2000 or 2001, her mother prohibited her and her sister, A.L., from going to appellant's house because of an incident that occurred during a sleepover. Specifically, R.C, A.L, and their friend, D.M., testified that they had spent the night at appellant's house and appellant put in a pornographic videotape for them to watch. D.M. testified that while the video was playing, *Page 5 
appellant was smiling and unzipped his pants. D.M. further testified that appellant told her and A.L. about him and his "wife" having sex.
 {¶ 8} Despite her mother's order that she was no longer allowed to go to appellant's house, A.L. continued to go. She testified that on one or two of those occasions, appellant would take her to the store to buy cigarettes and alcohol for her. Appellant allowed A.L. to drink the alcohol at his house, and requested only that she not drink it in front of his daughters or mother. A.L. further testified that R.C. would often ask appellant to purchase alcohol for her, but that he would refuse. She remembered one occasion, however, when appellant purchased alcohol for R.C.
 {¶ 9} The record demonstrates that R.C. had a problem with alcohol and drug use and had been hospitalized for alcohol abuse in the past. R.C, A.L. and Lee testified that R.C.'s problems were not a secret and were openly discussed with family and friends, including appellant.
 {¶ 10} R.C. testified that after she was hospitalized in the fall of 2004, her mother allowed her to go to appellant's house again. Lee explained that she allowed R.C. to go back to appellant's house at that time because her brother-in-law, Brian Thompson, had moved in with him. R.C. testified that when she would go to appellant's house, he would take her to the store to buy alcohol for her, which she would then consume at his house. R.C. further testified that appellant would sometimes call her and ask her to spend the night at his house and she would say *Page 6 
"no." Appellant then would tell her that he would buy alcohol for her if she agreed to sleep over.
 {¶ 11} R.C. also testified to discussions she had with appellant about sex, including him telling her that he could perform oral sex on her better than her boyfriend. According to R.C, one time when she was at appellant's house, he got chocolate syrup, put it on her toes, and tried to lick it off.
 {¶ 12} R.C. testified that appellant would continue to invite her to his house and that she would often ask if she could bring a friend. Appellant would often object, but eventually would give in and allow her to bring a friend. In regard to the incident which gave rise to the charges and convictions in this case, R.C. testified that sometime in July or August 2005, she and a friend, C.H., spent the night at appellant's house. R.C. and C.H. were supposed to sleep on the couch. The two girls consumed Bacardi and beer that appellant had given to them. R.C. described herself as not being drunk, but feeling "a little woozy" after she had the alcohol. She explained that she and Walker, appellant's "wife," had earlier gotten into a fight and Walker had gone to the front of the house.
 {¶ 13} R.C. testified that later in the evening, after appellant's daughters had gone to sleep upstairs, she, C.H. and appellant were all sitting on the couch watching television. R.C. stated that she was still awake, but had her eyes closed, when she noticed C.H. get up from the couch and lie down on the floor. R.C. testified that appellant started touching her over her clothes in her private area. She *Page 7 
explained that appellant then rubbed between her legs and touched her under her clothes, putting his fingers inside her vagina. R.C. testified that she just sat there pretending to sleep because she was scared.
 {¶ 14} According to R.C, appellant stopped when his mother came in and started yelling at him because she had discovered from Walker that he was alone with R.C. and C.H. R.C. explained that she did not initially tell anyone, including C.H., what had happened because she was scared. In December 2005, R.C. was admitted to the emergency room for overdosing on pills and cutting herself, and at that time, she first told of the incident with appellant.
 {¶ 15} C.H. also testified that she and R.C. had spent a night at appellant's house in the summer of 2005. She testified that R.C. had asked appellant to buy alcohol for them, and appellant did. According to C.H., R.C. was a little drunk, but she was not. C.H. explained that she, R.C. and appellant were sitting on the couch, with appellant in the middle. She stated that while she and R.C. were trying to go to sleep, she felt appellant rubbing his hands on her thighs, so she got up to sleep on the floor. She testified that she did not immediately tell anyone about the incident (including R.C.) because she did not want to get in trouble for drinking. It was not until R.C. made her allegations a few months later that C.H. revealed what had happened to her.
 {¶ 16} Another minor girl, M.T., also testified about an encounter she had with appellant. M.T.'s father (Lee's brother-in-law) moved in with appellant sometime in *Page 8 
2005, and she would go to appellant's house to visit her father. On one occasion, she and one of appellant's daughters were lying on a mattress in the living room watching television. M.T. testified that appellant put on a "nasty movie," and she and the daughter covered their eyes. Later, appellant asked his daughter to go get his cigarettes, but called M.T. back when she got up to go with the daughter. M.T. testified that appellant repeatedly called her name, and, when she looked up at him, he smiled at her and unzipped his pants.
 {¶ 17} Appellant's niece, Y.M., testified about an encounter she had with appellant that made her "little scared, frightened." The record indicates that the incident happened "a couple of years ago" from the time of trial. Specifically, Y.M. testified that she was at appellant's house and he asked her approximately three times to go upstairs with him. She testified that she thought his bedroom was upstairs and she was scared to go with him. She explained that she did not go with him, but instead went outside to play. She admitted that appellant did not say anything else to her, threaten or touch her, or try to force her to go upstairs.
 {¶ 18} Dr. Ann Wyse was the physician who examined R.C. on December 12, 2005. Dr. Wyse testified that R.C. told her that she had been sexually molested three months earlier by her aunt's boyfriend while she was under the influence of alcohol. Dr. Wyse further testified that R.C. had been admitted to the emergency room two nights earlier for taking too many valium pills. Dr. Wyse noted that R.C. had superficial cuts on one of her wrists. Dr. Wyse explained that she did not find *Page 9 
any signs of sexual abuse, nor did she expect to, given the three-month lapse in time between when the molestation was alleged to have occurred and the date of her exam.
 {¶ 19} Laura Russo, the registered nurse who treated R.C. on December 10, 2005, for the valium overdose, also testified. Russo explained that when she was taking R.C.'s medical history, R.C. revealed that she had been molested by her cousin in July. R.C. also told Russo that she had been to the hospital a few days before for cutting herself and that when she thought about what her cousin had done to her, she felt like cutting herself.
 {¶ 20} Lawrence Petrus, an employee of the Cuyahoga County Department of Children and Family Services, was assigned to investigate R.C.'s case. Petrus testified that he had a one-on-one interview with R.C. in her home in December 2005, to assess whether she was safe at the time and whether she needed follow-up medical and/or counseling services. R.C. told him that she had been sexually molested by appellant in August 2005, and that appellant had also acted in a perverted way towards her. Petrus testified that R.C. said she did not tell anyone because she had a problem with drinking and drugs, and she had been drinking on that occasion.
 {¶ 21} Detective Michael Kovach also investigated R.C.'s case. Kovach testified that he interviewed R.C, C.H., A.L., M.T., Lee and appellant. Kovach also obtained and executed a search warrant for appellant's house. He recovered two *Page 10 
pornographic videos during the search, which were admitted into evidence at trial.
 {¶ 22} In his first assignment of error, appellant contends that the trial court permitted inadmissible hearsay in violation of his rights to confrontation and cross-examination. In particular, appellant argues that the State's witnesses testified in violation of Crawford v.Washington (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177. We initially note that appellant has failed to cite specific instances of the admission of such testimony, as required by App.R. 16. Rather, appellant just broadly argues that "[t]he court, over defense objection, allowed witness after witness to testify to purely hearsay statements." That notwithstanding, we find no violation.
 {¶ 23} The Sixth Amendment's Confrontation Clause provides that, "in all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." In Crawford, the United States Supreme Court held that out-of-court statements that are testimonial are barred under the Confrontation Clause, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless of whether the statements are deemed reliable by the trial court. The Court defined these "testimonial" statements to include "ex parte in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would *Page 11 
reasonably expect to be used prosecutorially and extrajudicial statements * * * contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions, and statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 51-52.
 {¶ 24} Thus as to "testimonial evidence," "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." Id. at 68. "Where nontestimonial hearsay is at issue," however, the Court found it "wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law — as does [Ohio v.] Roberts [448 U.S. 56, 100 S.Ct. 2531,65 L.Ed. 2d 597], and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." 541 U.S. at 68.
 {¶ 25} Accordingly, the Court held that with nontestimonial hearsay, the Roberts, supra, reliability test still applies. See, e.g., State v.Muttart, Hancock App. No. 5-05-08, 2006-Ohio-2506. Under theRoberts standard, the Sixth Amendment right to confrontation does not bar the admission of a witness' statement against a criminal defendant if the statement bears "adequate `indicia of reliability.'" Id. at 66. The Roberts test is met when the evidence either falls within a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." Id.
 {¶ 26} Here, although appellant has failed to specify what testimony he believes was in violation of Crawford, a careful review of the record does not show *Page 12 
that there was any such testimony. Dr. Wyse and nurse Russo testified about R.C.'s diagnosis and treatment. The statements were not testimonial but, rather, were for the purpose of medical diagnosis and treatment, which is excepted from the hearsay rule. Evid.R. 803(4);State v. Johnson, Cuyahoga App. No. 80436, 2002-Ohio-7057.
 {¶ 27} Detective Kovach did not testify to the specifics of his interrogation of appellant or interview of any of the other witnesses. Rather, the sum and substance of his testimony was relative to the search of appellant's house and the pornographic videos recovered therefrom. His testimony, therefore, was not in violation ofCrawford or the hearsay rule.
 {¶ 28} Petrus, the employee from the Cuyahoga County Department of Children and Family Services, testified relative to his assessment of whether R.C. was safe at the time and whether she needed follow-up medical and/or counseling services. Such testimony was not testimonial in nature and fell within the medical diagnosis or treatment exception to the hearsay rule. The testimony of the other minor girls was admitted by the trial court as permissible other acts evidence and the propriety of that ruling will be discussed in the fourth assignment of error.
 {¶ 29} Further, appellant had the opportunity to confront all the witnesses at trial and cross-examine them. Therefore, Crawford was not implicated in this case. See State v. Grimes, Cuyahoga App. No. 87037,2006-Ohio-4262. *Page 13 
 {¶ 30} Based on the above analysis, we do not find any violation ofCrawford or the hearsay rule, and overrule appellant's first assignment of error.
 {¶ 31} In his second assignment of error, appellant contends that the State failed to present sufficient evidence to sustain the convictions. In his third assignment of error, appellant contends that the convictions were against the manifest weight of the evidence.
 {¶ 32} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different."State v. Thompkins, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, paragraph two of the syllabus. As a matter of appellate review, they involve different means and ends. Id. at 386-89. They also invoke different inquiries with different standards of review. Id.; State v.Smith, 80 Ohio St.3d 89, 113, 1997-Ohio-355, 684 N.E.2d 668. In the simplest sense, the difference is that sufficiency tests the burden of production while manifest weight tests the burden of persuasion.Thompkins at 390 (Cook, J., concurring).
 {¶ 33} Sufficiency is a question of law. Id. at 386; Smith, supra at 113. If the State's evidence is found to have been insufficient as a matter of law, then on appeal, the court may reverse the trial court.Thompkins at paragraph three of the syllabus, citing Section 3(B)(3), Article IV, Ohio Constitution. Under this construct, the State would have failed its burden of production, and as a matter of due process, the issue should not even have been presented to the jury.Thompkins at 386; Smith at 113. *Page 14 
 {¶ 34} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492, paragraph two of the syllabus, following Jackson v.Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. Under this standard, an appellate court does not conduct an exhaustive review of the record, or a comparative weighing of competing evidence, or speculation as to the credibility of any witnesses. Instead, the appellate court presumptively "view[s] the evidence in a light most favorable to the prosecution." Id. "The weight to be given the evidence and the credibility of witnesses are primarily for the trier of the facts." State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.
 {¶ 35} Manifest weight is a question of fact. Thompkins at 387. If the trial court's judgment is found to have been against the manifest weight of the evidence, then an appellate panel may reverse the trial court. Id. Under this construct, the appellate court "sits as the `thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony." Id.
 {¶ 36} In a manifest weight analysis, an appellate court "reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and * * * resolves conflicts in the evidence." Thompkins at 387. "A court reviewing questions of weight is not required to view the evidence in a light most *Page 15 
favorable to the prosecution, but may consider and weigh all of the evidence produced at trial." Id. at 390 (Cook, J., concurring). An appellate court may not merely substitute its view for that of the jury, but must find that "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id. at 387. See, also, id. at 390 (Cook, J., concurring) (stating that the "special deference given in a manifest-weight review attaches to the conclusion reached by the trier of fact."). Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." Id. at 387.
 {¶ 37} Finally, although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency when conducting the analysis; that is, a finding that a conviction was supported by the manifest weight of the evidence necessarily includes a finding of sufficiency. Thompkins at 388. In the present case, manifest weight is dispositive.
 {¶ 38} R.C. 2907.02(A)(1)(c) governs rape and provides:
 {¶ 39} "(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:
 {¶ 40} "* * *
 {¶ 41} "(c) The other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, *Page 16 
and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age."
 {¶ 42} R.C. 2907.05(A)(5) governs gross sexual imposition and provides:
 {¶ 43} "(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
 {¶ 44} "* * *"
 {¶ 45} "(5) The ability of the other person to resist or consent or the ability of one of the other persons to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the ability to resist or consent of the other person or of one of the other persons is substantially impaired because of a mental or physical condition or because of advanced age."
 {¶ 46} Appellant argues that there was no physical evidence of any molestation. As explained by Dr. Wyse, she did not expect to find any evidence of sexual abuse given the three-month lapse in time between when the molestation was alleged to have occurred and the date of her exam. This court has upheld a rape conviction where there was no physical evidence of rape and the victim did not *Page 17 
immediately report the rape. See State v. Abdussatar, Cuyahoga App. No. 86406, 2006-Ohio-803.
 {¶ 47} Appellant also argues that due to R.C.'s substance abuse and emotional problems, her testimony was not credible. In attacking R.C.'s credibility, appellant argues that A.L. testified that when R.C. asked him to buy alcohol for her, he refused, thereby insinuating that R.C.'s testimony about appellant buying alcohol for her was untrue. Although it is true that A.L. testified that R.C. would often ask appellant to purchase alcohol for her, and that he would refuse, she did testify that she remembered one occasion when appellant did purchase alcohol for R.C. Further, A.L. testified that on one or two of the occasions when she went to appellant's house, appellant took her to the store to buy her cigarettes and alcohol. Appellant allowed A.L. to drink the alcohol at his house, as long as she did not drink it in front of his daughters or mother. R.C.'s testimony that appellant purchased alcohol for her as well, therefore, is not that incredible. Moreover, credibility is primarily a determination for the trier of the facts. DeHass, supra at paragraph one of the syllabus.
 {¶ 48} Appellant further argues that his convictions were against the manifest weight of the evidence because the court allowed the admission of the other acts testimony, which characterized him as "some sort of deviant sex monster." The admission of the other acts testimony will be discussed in detail below, but as a general summation, the testimony was not admitted to show that appellant acted in *Page 18 
conformity therewith but, rather, to show appellant's common plan in allowing minor girls to come to his home, drink alcohol that he supplied to them, and/or watch pornographic videos, and talk about and/or be subjected to sexual behavior.
 {¶ 49} R.C. testified that she was "a little woozy" from the alcohol she consumed, and C.H. testified that R.C. was drunk. R.C. testified that as she, C.H. and appellant were sitting on the couch, she noticed that C.H. got up from the couch and laid on the floor. R.C. further testified that after C.H. had removed herself from the couch, appellant rubbed his hand in her private area over her clothes. R.C. testified that appellant then proceeded to rub underneath her clothing and put his fingers into her vagina. C.H. testified that the reason she removed herself from the couch was because appellant was rubbing his hands on her thighs.
 {¶ 50} Based on the evidence presented at trial, we do not find that appellant's convictions were against the manifest weight of the evidence and, therefore, also find no merit to his sufficiency of the evidence challenge. The second and third assignments of error are overruled.
 {¶ 51} In his fourth and final assignment of error, appellant argues that the trial court erred in allowing other acts testimony because its prejudicial effect outweighed its probative value, thereby depriving him of a fair trial.
 {¶ 52} Evid.R. 404(B) governs other crimes, wrongs, or acts and provides:
 {¶ 53} "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It *Page 19 
may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 {¶ 54} Similarly, R.C. 2945.59 governs proof of a defendant's motive and provides:
 {¶ 55} "In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."
 {¶ 56} The State's position in requesting the trial court to allow the testimony of the other minor girls was that appellant had a pattern of conduct in allowing minor girls to come to his home, view pornographic videos, and/or drink alcohol, and talk about and/or be subjected to sexual behavior. The girls' testimony, with the exception of Y.M., was indeed similar to R.C.'s testimony.
 {¶ 57} In particular, in regard to the 2000 or 2001 incident, A.L., and D.M. corroborated R.C.'s testimony that they had spent the night at appellant's house and appellant put in a pornographic videotape for them to watch. D.M. testified that while the video was playing, appellant was smiling and unzipped his pants. Similarly, M.T. *Page 20 
testified that on one of her visits to appellant's house to see her father, she was alone with appellant after he asked his daughter to get his cigarettes and requested that she stay with him, and he smiled at her and unzipped his pants. Moreover, A.L. testified that on one or two of the times she would sneak to appellant's house, he purchased alcohol for her and allowed her to consume it in his house.
 {¶ 58} C.H. testified as to her encounter with appellant on the night that gave rise to the charges in this case. C.H. testified that she, R.C. and appellant were sitting on the couch, with appellant in the middle. C.H. explained that while she and R.C. were trying to go to sleep, she felt appellant rubbing his hand on her thighs, so she got up to sleep on the floor. That testimony demonstrated appellant's common scheme, which he then utilized on R.C. In particular, R.C. testified that while she was still awake, but had her eyes closed, she noticed C.H. get up from the couch where they were sitting with appellant and lie on the floor. R.C. testified that appellant started touching her over her clothes in her private area. She explained that appellant then rubbed between her legs and touched her under her clothes, putting his fingers inside her vagina.
 {¶ 59} Upon review, we find that the testimony of the minor girls, with the exception of Y.M.'s testimony, was properly admitted to show that appellant engaged in a pattern of having minor girls at his house, showing them pornographic videos, and/or allowing them to drink alcohol, and acting and/or talking in a sexual manner with them. On the record, therefore, the probative value of the evidence was *Page 21 
not substantially outweighed by the possibility of unfair prejudice. SeeState v. Ervin, Cuyahoga App. No. 80473, 2002-Ohio-4093; State v.Russell, Cuyahoga App. No. 83699, 2004-Ohio-5031.
 {¶ 60} Moreover, the trial court instructed the jury as follows in regard to the other acts evidence:
 {¶ 61} "Evidence was received about the commission of other acts other than the offenses with which the Defendant is charged in this trial. That evidence was received only for a limited purpose. It was not received and you may not consider it to prove the character of the Defendant, in order to show that he acted in conformity and/or accordance with that character.
 {¶ 62} "If you find that the evidence of other acts is true and that the Defendant committed those acts, you may consider that evidence only for the purpose of deciding whether it proves the Defendant's opportunity, preparation, intent, or purpose and/or plan to commit the offense charged in this trial. That evidence cannot be considered for any other purpose."
 {¶ 63} In regard to Y.M.'s testimony that appellant scared her by asking her to go upstairs alone with him, while it arguably did not show appellant's common plan or scheme as did the other minor girls' testimony, we find if error, to be harmless. Harmless error is "[a]ny error, defect, irregularity, or variance which does not affect substantial rights." Crim.R. 52(A). Y.M. admitted that she did not go upstairs with appellant, that he did not say anything else to her, threaten or touch her, or try to *Page 22 
force her to go upstairs. Based on the above analysis, appellant's fourth assignment of error is overruled.
 {¶ 64} Appellant's convictions are affirmed. The case is remanded, however, for correction of the trial court's entry of conviction as described in footnote two.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MARY EILEEN KILBANE, P.J., and MELODY J. STEWART, J., CONCUR.
[1] To protect the identity of the minor victim and other minors involved in this case, we use their initials.
[2] The court's July 28, 2006, entry of conviction states, however, that the jury found appellant guilty of the sexually violent predator specifications. The case therefore is remanded for correction of the entry.
[3] Lee and Walker are cousins. *Page 1